## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| MARTIN A. WACHEL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.:  2:05-CV-292-PRC |
| | ) | |
| FIRST COLONY LIFE INSURANCE CO. and | ) | |
| TRANSAMERICA OCCIDENTAL LIFE | ) | |
| INSURANCE CO., | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on Transamerica's Motion for Summary Judgment [DE 62], filed on August 14, 2007; First Colony's Motion for Summary Judgment [DE 65], filed on August 14, 2007; a Plaintiff's Motion to Strike Paragraph 8 from the Affidavit of Tracy Livingston in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 70], filed on September 14, 2007; a Plaintiff's Motion to Strike Paragraph 13 from the Affidavit of John Reynolds in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 71], filed on September 14, 2007; a Motion to Determine Spoliation of Evidence in Opposition to Transamerica's Rule 56 Motion [DE 72], filed by the Plaintiff, Martin A. Wachel ("Wachel"), on September 14, 2007; a Plaintiff's Motion to Strike Paragraph 8 from the Affidavit of John Reynolds in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 73], filed on September 14, 2007; and a Plaintiff's Motion to Strike Late-Disclosed Pages of Exhibit A3 to the Affidavit of Robert Embrey in Support of Rule 56 Motion of First Colony Life Insurance Co. [DE 86], filed on September 26, 2007.

On September 17, 2007, Wachel filed a response in opposition to Defendant Transamerica Occidental Life Insurance Co.'s ("Transamerica") Motion for Summary Judgment, and on October

16, 2007, Transamerica filed a reply.  On September 18, 2007, Wachel filed a response in opposition to Defendant First Colony Life Insurance Co.'s ("First Colony") Motion for Summary Judgment, and on October 16, 2007, First Colony filed a reply.

On October 16, 2007, Transamerica filed responses to Wachel's Motion for Spoliation and three Motions to Strike certain documents from Transamerica's Motion for Summary Judgment filings.  Also on October 16, 2007, First Colony filed a response to Wachel's Motion to Strike certain documents from First Colony's Motion for Summary Judgment filings.  Wachel did not file replies in support of his Motion for Spoliation or four Motions to Strike and the time to do so has passed.

For the following reasons, the Court awards summary judgment to Defendant First Colony and grants in part and denies in part Defendant Transamerica's Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On July 14, 2005, Wachel, a citizen of Indiana, filed a Complaint for Declaratory Relief in the Lake County Superior Court.  Wachel's Complaint seeks a declaration that he is entitled to the proceeds of two life insurance policies, one issued by First Colony for $1,000,000, and one issued by Transamerica for $250,000, to David Allen Kandalec ("Kandalec").  Further, Wachel alleged that First Colony and Transamerica breached their duty to deal with Wachel in good faith.

On August 4, 2005, First Colony, a Virginia corporation, and Transamerica, a California Corporation (collectively, "Defendants"), filed a Notice of Removal, removing this case to the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C. §§ 1332 and

1441(a).  On September 6, 2005, the Defendants collectively filed an Answer to Complaint and Affirmative Defenses.

On June 23, 2006, Wachel filed a Motion to Amend Complaint, seeking to add two counts, one against each Defendant, for loss of use of the money that Wachel contends he is entitled to recover under the life insurance policies.  The Defendants did not respond to Wachel's Motion to Amend and the Court issued an order on July 17, 2006, granting the Motion.  On July 19, 2006, Wachel filed a First Amended Complaint for Declaratory Relief.  On August 4, 2006, the Defendants collectively filed an Answer to Plaintiff's Amended Complaint and Affirmative Defenses.

On August 14, 2007, the Defendants each filed a Motion for Summary Judgment.  On September 14, 2007, Wachel filed three Motions to Strike, seeking to strike certain documents filed in support of Transamerica's Motion for Summary Judgment, and a Motion for Spoliation, seeking an adverse inference regarding three pages of medical records that were allegedly excluded from Transamerica's discovery responses.  On September 17, 2007, and September 18, 2007, Wachel filed responses to the Motions for Summary Judgment.  On September 26, 2007, Wachel filed an additional Motion to Strike, seeking to strike material from First Colony's summary judgment filings.  On October 16, 2007, the Defendants filed replies in support of their Motions for Summary Judgment and responses to Wachel's Motions to Strike and Motion for Spoliation.  The Motions are now fully briefed and before the Court.

The parties consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

3

In this Opinion and Order, the Court will separately address each of the parties' seven pending Motions.

## MOTION FOR SPOLIATION

In his Motion for Spoliation, Wachel requests that the Court make a determination as a matter of law that Transamerica is suppressing or has destroyed evidence, and find that an adverse inference results from the suppressed or destroyed evidence. Specifically, Wachel contends that Transamerica has not produced three pages of medical records that it received from Kandalec's physician, Dr. Fred Adler, as part of an Attending Physician Statement ("APS") provided to Transamerica before it approved Kandalec for an insurance policy. Wachel argues that the Court can assume that the three pages concern Kandalec's alcohol treatment and abuse, which Transamerica states it was not aware of when it issued Kandalec's life insurance policy. Wachel states that the missing records are adverse to Transamerica's claim that it had no notice of Kandalec's alcohol related problems.

As a threshold matter, Transamerica contends that the instant Motion does not satisfy the standards provided by the Federal Rules of Civil Procedure, Rule 7, for the formation of a motion because it does not request relief typical of other motions filed in federal court. It is true that a claim for spoliation of evidence is often brought as a substantive claim in a charging party's complaint. However, courts within this district have considered motions for spoliation of evidence as well. *See Gaskin v. Sharp Elec. Corp.*, No 2:05-CV-303, 2007 WL 2572397, at *10-11 (N.D. Ind. Aug. 31, 2007). The United States Court of Appeals for the Seventh Circuit found that spoliation has two distinct applications, the first being a permissive evidentiary inference. *See J.S. Sweet Co., Inc. v.*

4

*Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005) (citing *Morris v. Buchanan*, 44 N.E.2d 160 (Ind. 1942)).  The Court finds that here, Wachel seeks a permissive evidentiary inference, and although the request comes at the summary judgment stage rather than a request for an evidentiary instruction to a jury as was contemplated in *J.S. Sweet Co.*, the Motion for Spoliation is a properly formed motion requesting specific relief from the Court.  Thus, the Court will evaluate the Motion based on its merits.

Transamerica also raises choice of law as an issue in deciding the Motion for Spoliation. Transamerica, stating that the Seventh Circuit has not ruled on this issue, conducts a survey of other federal circuits that have addressed choice of law when interpreting a claim for spoliation of evidence.  Relying on its survey, which identifies the United States Courts of Appeals for the Fourth, Fifth, and Eleventh Circuits as having found that federal law applies to claims of spoliation of evidence, Transamerica encourages the Court to follow suit.  However, recent cases decided by courts within this circuit have applied state law when evaluating claims for spoliation of evidence. *See J.S. Sweet Co.*, 400 F.3d at 1032 (parties agreed that Indiana law governed claim for spoliation of evidence); *Gaskin*, 2007 WL 2572397 at *11; *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, No. 97 C 2694, 1999 WL 966477, at *2 (N.D. Ill. Oct. 1, 1999) (considering a choice of law between two different states' laws to interpret spoliation of evidence claim).

The Court reserves judgment on the choice of law issue, finding that under either Seventh Circuit or Indiana law, Wachel fails to make the necessary showing to satisfy a claim for spoliation of evidence.  The prevailing rule in the Seventh Circuit "is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction."  *Coates v. Johnson &*

*Johnson*, 756 F.2d 524, 551 (7th Cir. 1985); *see also Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001).   Indiana law similarly defines spoliation as "'the intentional destruction, mutilation, alteration, or concealment of evidence, usually a document.   If proved, spoliation may be used to establish that the evidence was unfavorable to the party responsible.'"  *Gaskin*, 2007 WL 2572397 at *11 (quoting *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000)).   In Indiana, "the exclusive possession of facts or evidence by a party, coupled with the suppression of the facts or evidence by that party, may result in an inference that the production of the evidence would be against the interest of the party which suppresses it."  *Gaskin*, 2007 WL 2572397 at *11 (citing *Cahoon*, 734 N.E. 2d at 545).

Here, Wachel's theory underlying his claim for spoliation is supported by a single piece of evidence, page numbers at the top of Kandalec's medical records that were faxed by his treating physician, Dr. Adler, to a third-party vendor, ScanTech.  ScanTech then turned the records over to Transamerica via Transamerica's secure website.  ScanTech requested that Dr. Adler produce an APS and include medical records of the doctor's treatment of Kandalec for the past five years.  The numbers at the top of the faxed records that were produced to Wachel in discovery begin at " p. 4." Wachel infers that there must have been three pages before p. 4, numbered p. 1, p. 2, and p. 3, and that Transamerica received and then failed to turn the three pages over along with the nine pages of medical records that were turned over in discovery.   Wachel, without any support beyond speculation, suggests that the three pages are records of a June 14, 1998, visit by Kandalec to St. Catherine Hospital for gastritis, vomiting, chest pain, and alcohol intoxication.[1]  Attempting to locate or verify the existence of the three pages of medical records, Wachel states that he deposed Dr.

_____

[1]Transamerica contends that it did receive records of Kandalec's June 14, 1998, hospital visit at a later date, in response to another record request from Dr. Adler.  Transamerica then turned the records over to Wachel.

Adler and hired legal counsel in Kansas and Missouri, who then subpoenaed ScanTech and traveled to Kansas for depositions. Despite his efforts, Wachel was unable to discover any proof that the three pages exist, that Transamerica received the pages, or that Transamerica acted intentionally or with bad faith to keep the pages from Wachel.

Opposing Wachel's Motion, Transamerica relies on John Reynolds' deposition testimony. Reynolds is currently a Senior Underwriting Consultant for Transamerica, and in 2003 was employed as a Senior Underwriter and was personally involved in underwriting Kandalec's life insurance policy. Reynolds testified that the nine pages of medical records produced by Transamerica in discovery were the only medical records he reviewed in underwriting Kandalec's life insurance policy. Reynolds testified that he could not verify every page of medical evidence reviewed in 2003 but that the records produced to Transamerica by third-party vendor ScanTech were the complete set of medical records in the underwriting file. In addition, in a sworn affidavit, Reynolds states that besides the nine pages of medical records, "I did not receive or review any other medical records of David A. Kandalec." Def.'s Resp. Br. Ex. B ¶ 8.

Transamerica suggests that the absence of the pages numbered p. 1, p. 2, and p. 3 may be a result of Dr. Adler's method of production and that the wrong page numbers may have appeared on the faxed pages. Transamerica also suggests that the absence of the June 14, 1998, hospital visit resulted from Dr. Adler's inexact record keeping. Transamerica states that while Dr. Adler produced only nine pages in response to ScanTech's initial request for production of an APS for his treatment of Kandalec over the past five years, in response to a later subpoena issued to Dr. Adler by Transamerica requesting all of the medical records relating to treatment of Kandalec, Dr. Adler produced sixty pages, including twenty pages of medical records. Transamerica also suggests that

the missing pages may, rather than medical records, be ScanTech's document request form, a fax cover page, and an authorization form signed by Kandalec.  Transamerica's theories regarding the three pages are as speculative as Wachel's theory that Transamerica destroyed medical records.  However, the theories do establish that Wachel has not proven the singular proposition that Transamerica was in possession of the documents prior to issuing a life insurance policy to Kandalec.  Instead, multiple theories abound and it remains unclear that Transamerica was in possession of any additional medical records that it failed to produce or disclose to Wachel.  The Court therefore finds that under both Indiana and federal law, Wachel has not made the required showing necessary for an adverse inference due to spoliation of evidence.

**MOTION TO STRIKE PARAGRAPH 8 FROM TRACY LIVINGSTON'S AFFIDAVIT**

Wachel moves to strike paragraph eight from the affidavit of Tracy Livingston as information outside Livingston's personal knowledge.  Livingston is currently the Managing Director of Underwriting for Transamerica, who in 2003, when Kandalec's policy was issued, was a Managing Consultant of Underwriting for Transamerica and worked on life insurance polices for $5,000,000 or more in face amount or $25,000 or more in premiums.  Transamerica filed Livingston's affidavit in support of its Motion for Summary Judgment.  Wachel asserts that Livingston's affidavit was made in bad faith and as a result asks that the Court award sanctions pursuant to Federal Rule of Civil Procedure 56(g).  Transamerica argues that Livingston had personal knowledge of everything he asserted in his affidavit.

Federal Rule of Civil Procedure 56(e) discusses affidavits filed in support of summary judgment and, in part, provides, "Supporting and opposing affidavits shall be made on personal

knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

> In paragraph eight of his affidavit, Livingston states:

> David A. Kandalec's completed Application was submitted to TRANSAMERICA. In reliance upon the representations in the Application as to David A. Kandalec's medical history and background, TRANSAMERICA issued policy no. 42 093 931 with an issue date of March 15, 2003, insuring the life of David A. Kandalec in accordance with the terms, conditions, exclusions and limitations of the Policy for a sum insured in the amount of $1,000,000.00. . . .

Def.'s Summ. J. Br. Ex. A ¶ 8.  Wachel argues that nowhere in his affidavit does Livingston state that he was personally involved in approving Kandalec's policy.  Thus, Wachel contends that the assertion that Kandalec's policy was approved based on a review of his application is outside Livingston's personal knowledge.  Wachel also contends that the affidvit submitted by Transamerica underwriter John Reynolds, who was personally involved in underwriting Kandalec's policy, is inconsistent with Livingston's paragraph eight.  Reynolds' affidavit provides that in reviewing Kandalec's application, Reynolds reviewed materials outside the application itself.  Wachel argues that this directly contradicts the assertion made in Livingston's paragraph eight, which only mentions the application as a document relied on to approve the policy.

In response, Transamerica argues that Wachel misread the affidavit.  Paragraph one of Livingston's affidavit provides, in part, "I have personal knowledge of the facts set forth in this affidavit, such that, if called as a witness, I could competently testify to the facts stated herein." Def.'s Summ. J. Br. Ex. A ¶ 1.  Paragraphs two and three go on to set forth Livingston's educational and professional experience, including a detailed recitation of his experience and qualifications as an underwriter.  Transamerica therefore argues that based on his experience, training, knowledge

of Transamerica's underwriting procedures, and representation in paragraph one of the affidavit, Livingston is qualified to testify to everything contained within his affidavit.

Transamerica cites numerous cases for the proposition that in evaluating whether a misrepresentation on an application for insurance is material, a legal question at issue in the Defendants' Motions for Summary Judgment, "the final inquiry is what *that company* might reasonably have done." *Bush v. Washington Nat'l Ins. Co.*, 534 N.E.2d 1139, 1142 (Ind. Ct. App. 1989) (citing *New York Life Ins. Co. v. Kuhlenschmidt* 33 N.E.2d 340 (Ind. 1941)). Transamerica contends that based on this standard, Livingston is not required to testify from personal knowledge, but rather, as an experienced Transamerica underwriter, he is able to testify as to what the company would have reasonably done. The Court agrees that the above quoted passage is a correct statement of the law; however, it addresses an issue other than the one involved in the instant dispute. The issue addressed by the law quoted above, whether Kandalec's application contained a material misstatement, or what the company would have reasonably done, is addressed *infra*. In paragraph fifteen of his affidavit, Livingston affirms, "TRANSAMERICA would not have issued the policy for David A. Kandalec if it had known his true health history . . ." Def.'s Summ. J. Br. Ex. A ¶ 15. Paragraph fifteen is a statement concerning company policy and procedure that Livingston, as an experienced underwriter, can make based on his knowledge of what the company might reasonably have done. It is not specific to the review of Kandalec's application.

However, the instant dispute concerns Livingston's competency to affirm a particular statement, namely what documents were relied upon in issuing a life insurance policy to Kandalec. Livingston reveals in his affidavit that at the time Kandalec's policy was approved, he was working on policies involving coverage of $5,000,000 or more, and thus he could not have worked on

Kandalec's policy, which was issued for $1,000,000.  If he did not work on the policy, the Court knows of no other way that Livingston could say that Transamerica relied on Kandalec's application except by hearsay.  The Court finds that because Livingston was not personally involved in the review or approval of Kandalec's application for life insurance, he is not competent to make statements about what went into that review and approval.  Such statements are outside Livingston's personal knowledge, and pursuant to Rule 56(e), are not appropriate for an affidavit supporting summary judgment.  While the statement was outside Livingston's personal knowledge, the Court does not find that it was made in bad faith or solely for the purpose of delay.  Therefore, the Court denies Wachel's request for sanctions based on paragraph eight of Livingston's affidavit.

**MOTION TO STRIKE EXHIBIT A4, PARAGRAPH 8 FROM REYNOLDS' AFFIDAVIT**

Similar to his first Motion to Strike, Wachel next requests that the Court strike paragraph eight from the affidavit of John Reynolds, a Senior Underwriter for Transamerica, as information outside Reynolds' personal knowledge.  Wachel asserts that Reynolds' paragraph eight was made in bad faith and requests that the Court award sanctions against Transamerica.  Transamerica contends that it is uncontroverted that Reynolds testified to what he remembers, and thus, his testimony concerned only his personal knowledge.

John Reynolds affidavit provides the following in paragraph eight:

My review of David A. Kandalec's application for insurance included the Application, the paramed report, the lab report showing the results of Mr. Kandalec's blood and urine tests, and the medical records received from Dr. Adler's office through ScanTech attached hereto as Exhibits A2, A3, and A4 respectively.  I did not receive or review any other medical records of David A. Kandalec. . . .

11

Def.'s Summ. J. Br. Ex. B ¶ 8.   Wachel contends that Reynolds' statement that Exhibit A4 constitutes every medical record he reviewed in connection to Kandalec's application for life insurance is hearsay, beyond his personal knowledge.   Wachel argues that the statement concerns out of court conduct by a representative of Transamerica who printed a paper copy of Kandalec's medical records from a computer file and then gave a copy of the file to Reynolds approximately one year later.   Wachel also argues that Reynolds' affidavit does not affirmatively show that he was able to identify the contents of Exhibit A4 from his own personal knowledge, and that "there is no way" he could have such personal knowledge of documents that he reviewed over four years earlier in February, 2003.   Pl.'s Mot. to Strike Reynolds' Aff. ¶ 8, 2.

Wachel points to Reynolds' deposition, taken on May 31, 2007, in which Reynolds, in response to a question of whether there are any additional medical records that he reviewed prior to approving Kandalec's application, stated "I would have to look at the deposition papers, but it was all printed from the file.   If this is the full printout, then, yes, I would assume that's all the pages." Pl.'s Summ. J. Resp. Br. Ex. 1, 22.   Wachel argues that Reynolds changed from assuming that all the medical records are contained in the exhibit in his May, 2007 deposition to affirmatively stating that all the medical records were contained in Exhibit A4 in his July, 2007 affidavit.   Wachel contends that as a result of this perceived uncertainty, paragraph eight is not based on Reynolds' personal knowledge.   Wachel therefore asks that paragraph eight and Exhibit A4 be stricken.

Transamerica, in response, also points to Reynolds' deposition testimony.   Reynolds gave the following answers to the following questions:

> Q: To be clear, you looked at pages 16 through 24 [the 9 pages of medical records received from ScanTech] before you made the decision to offer the insurance on Mr. Kandalec's life; is that right?

. . . .

A: Correct.

Q: You looked at those records, the application, the blood test, and the urine test; is that right?

. . . .

A: Correct, and the paramedical exam.

. . . .

Q: And you believe when you looked at all this information that you've just described that you had all the information that was necessary to make the decision on how much and what type of insurance to offer on Mr. Kandalec's life; is that right?

A: Correct.

Def.'s Resp. Br. Ex. A, 3.

The Court finds that based on the affidavit and the deposition testimony of Reynolds, even if it is unlikely that he can remember the exact pages he reviewed in early 2003 when reviewing Kandalec's application for life insurance, there is no evidence establishing that the statement contained in paragraph eight of his affidavit is outside Reynolds' personal knowledge. The statement is not hearsay, as Reynolds affirms that it is a statement of his own personal recollection of his review of Kandalec's application. Paragraph four of Reynolds' affidavit provides, "In January of 2003, in my capacity as an underwriter of TRANSAMERICA, I had occasion to review David A. Kandalec's application for life insurance and, as such, have personal knowledge of the matters stated in this Affidavit, such that, if called as a witness, I could competently testify to the facts stated herein." Def.'s Summ. J. Br. Ex. A ¶ 4. This paragraph is the statement of personal knowledge that

the Livingston affidavit is missing, and it directly addresses the statement made in paragraph eight of Reynolds' affidavit.

Thus, based on the lack of evidence that the statement contained in paragraph eight of Reynolds' affidavit is outside his personal knowledge, and Reynolds' representations and testimony to the contrary, the Court denies Wachel's Motion to Strike paragraph eight of Reynolds' affidavit. In addition, the Court does not find that Wachel has established a sufficient reason to strike Exhibit A4, attached in support of Transamerica's Motion for Summary Judgment, and denies Wachel's Motion to Strike as it pertains to the exhibit.  Finally, the Court denies Wachel's request for Rule 56(g) sanctions, finding that paragraph eight of Reynolds' affidavit was not made in bad faith or solely for purposes of delay.

### MOTION TO STRIKE PARAGRAPH 13 OF JOHN REYNOLDS' AFFIDAVIT

In his third Motion to Strike, Wachel requests that the Court strike paragraph thirteen of Reynolds' affidavit because it allegedly conflicts with material assertions contained in paragraph eight of the affidavit.  Again, Wachel requests that the Court award sanctions pursuant to Rule 56(g).  Transamerica argues that Wachel misinterpreted paragraph thirteen, and that when interpreted correctly, Reynolds' representations are consistent with other statements contained within his affidavit.

Paragraph thirteen of Reynolds' affidavit states:

In reliance upon David A. Kandalec's representations in the Application, I approved the issuance of the Policy.  However, based upon my knowledge and experience as a life insurance underwriter for TRANSAMERICA, and in accordance with TRANSAMERICA's underwriting guidelines and practices, I would not have approved the issuance of the Policy for David A. Kandalec if I had known his true health history, including, specifically, his history and treatment for alcoholism and

14

alcohol abuse.  Rather, I would have declined the application for insurance and the
Policy would not have been issued.

Def.'s Summ. J. Br. Ex. B ¶ 13.  Wachel interprets the first sentence of this statement to be an

affirmation by Reynolds that in approving Kandalec's policy, he *only* reviewed Kandalec's

application.  Wachel contends that this statement conflicts with paragraph eight, which quoted in

the section above, states that Reynolds reviewed Kandalec's application for insurance, a paramed

report, a lab report showing results of blood and urine tests performed on Kandalec, and medical

records received from Dr. Adler's office.  Wachel also relies on Reynolds' deposition testimony that

he relied on the medical reports in finding Kandalec eligible for a life insurance policy.   Wachel

argues that paragraph thirteen is impeached by paragraph eight and Reynolds' deposition testimony,

and as a result must be stricken.   Wachel also attempts to construct an argument that the

representations contained in Reynolds' affidavit, combined with his deposition testimony, placed

him on notice of Kandalec's health issues.  This argument is inappropriate for a Motion to Strike and

is considered by the Court in depth, *infra*, in connection with the Defendants' Motions for Summary

Judgment.

As to whether paragraph thirteen should be stricken, Transamerica responds that paragraph

thirteen does not state that Reynolds *only* relied upon Kandalec's application.  Rather, paragraph

thirteen states that Reynolds relied on the application.  Paragraph eight of the affidavit specifically

sets forth all of the materials that Reynolds considered in issuing a policy to Kandalec.  In evaluating

Reynolds' affidavit, the Court reads the document as a whole, and specifically, reads paragraph

thirteen in conjunction with paragraph eight.  Reynolds considered a number of documents outside

Kandalec's application in deciding whether to approve a life insurance policy.  In addition, Wachel's

argument that paragraph thirteen is impeached by paragraph eight and Reynolds' deposition

testimony goes to the reliability of Reynolds' testimony and is not a proper argument that would give the Court cause to strike paragraph thirteen. Therefore, the Court finds that paragraph thirteen concerns matters within Reynolds' personal knowledge and is a proper statement for his affidavit. The Court denies Wachel's Motion to Strike paragraph thirteen of Reynolds' affidavit and denies his request for Rule 56(g) sanctions.

## MOTION TO STRIKE PART OF EXHIBIT A3 TO ROBERT EMBREY'S AFFIDAVIT

Wachel's final Motion to Strike requests that the Court strike three pages contained within Exhibit A3 of Robert Embrey's affidavit, which was submitted in support of First Colony's Motion for Summary Judgment, because the pages were disclosed after the discovery deadline. Wachel does not request sanctions in this Motion. First Colony contends that the Motion to Strike is untimely because it was filed one week after Wachel filed his response to First Colony's Motion for Summary Judgment. First Colony also argues that it seasonably produced the three pages at issue, which only became relevant following the June 7, 2007, deposition of First Colony underwriter George Young. Wachel did not file a reply and the time to do so has passed.

Local Rule 56.1 provides, "In the text of the supporting brief or an appendix thereto, filed in support of a motion for summary judgment pursuant to Local Rule 7.1, there shall be a []Statement of Material Facts, supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence . . ." N.D. Ind. L.R. 56.1(a). Federal Rules of Civil Procedure Rule 26(a) states, "a party must, without awaiting a discovery request, provide to other parties: . . . a copy of, or a description by category and location of, all documents . . . that are in the possession, custody, or control of the party and that the disclosing party may use to

support its claims or defenses."  Fed. R. Civ. P. 26(a), (a)(1)(B).  Rule 26 further provides, in subdivision (e), "A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1).  Discussing seasonable supplementing of discovery, Rule 37 provides, "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1).

Wachel asserts that the Court should disregard pages seventeen through nineteen of Exhibit A3 because they were produced after discovery closed and the late disclosure results in prejudice.  The three pages at issue appear to be computer screen printouts of a First Colony online manual discussing gastrointestinal disorders (liver tests), liver enzymes, alkaline phosphatase, and liver function tests.  Wachel contends that the production of the three pages after the discovery deadline resulted in prejudice but does not explain how.

Borrowing Wachel's basis for filing the instant Motion, First Colony initially contends that the instant Motion is untimely because it was filed over a week after Wachel's deadline to respond to the Defendants' Motions for Summary Judgment.  The Court finds that no prejudice or undue hardship resulted from the filing of the instant Motion.  The Court further finds that the Motion was filed in compliance with Local Rule 56.1, and thus the Court continues beyond the alleged procedural shortcoming to consider the substance of the Motion to Strike.

First Colony argues that it timely disclosed the three pages at issue and that in any event, Wachel was not prejudiced as a result of the timing of the disclosure.  Discovery in this matter closed on June 1, 2007, except for the deposition of First Colony underwriter George Young, which occurred on June 7, 2007.  First Colony contends that the three pages at issue only became relevant to this matter after the deposition of George Young, and therefore, First Colony could not have disclosed the documents prior to the discovery cut-off.  In his deposition, George Young and the attorneys questioning him discussed acceptable limits for the liver enzyme alkaline phosphatase as related to alcohol abuse, and the First Colony guidelines that address those enzyme levels.  Counsel for Wachel asked George Young if, when he returned to his office, he could find the First Colony guideline page that discusses the liver enzyme alkaline phosphatase and its upper limit.  Young responded that he could.  First Colony states that prior to George Young's deposition, the issue of the liver enzyme alkaline phosphatase was never addressed and it was not clear that Wachel considered it an issue relevant to his case.

On August 14, 2007, counsel for First Colony sent a cover letter to counsel for Wachel, stating that it was disclosing the three pages now at issue as a supplement to First Colony's Rule 26(a) disclosures, and in connection to George Young's June 7, 2007 deposition.  First Colony also contends that Wachel was apprised of the substance of these documents on June 7, 2007, through George Young's testimony, which described First Colony's upper limit guideline for alkaline phosphatase enzyme.  George Young testified that "[o]n a blood profile an underwriter would look at all the liver enzymes, not just one liver enzyme.  If only one is elevated, if it were less than one and a half times the upper limits of normal, the underwriter could in their own judgment say that that's not a significant elevation."  Def.'s Resp. Br. 6.

Wachel failed to submit an argument to rebut First Colony's arguments that disclosure was timely and that in any event no prejudice resulted. Thus, the Court has no reason to not believe First Colony's representation that the three pages first became relevant at the June 7, 2007, deposition. The Court finds that having first arisen as relevant material on June 7, 2007, First Colony's production of the documents on August 14, 2007, was a seasonable supplement in accordance with Rule 26(e) that did not result in prejudice to Wachel. Therefore, the Court denies Wachel's Motion to Strike Exhibit A3 to Robert Embrey's Affidavit.

## MOTIONS FOR SUMMARY JUDGMENT

The Defendants move for summary judgment, alleging that no genuine issue of material fact exists as to any of Wachel's claims in this matter and that summary judgment should be awarded in their favor as a matter of law. Because they address largely the same facts and legal issues, the Court will address the Defendants' Motions for Summary Judgment in combination.

## FACTUAL HISTORY

Following are the facts viewed in the light most favorable to the nonmoving party, the Plaintiff.

In January of 2003, David Kandalec applied to Transamerica for life insurance coverage in the amount of $1,000,000. In his application, Kandalec named his employer, the Plaintiff in this action, Martin Wachel, as policy owner and beneficiary. Kandalec identified himself as a key employee and personal friend of Wachel's. The application consists of two parts. Kandalec completed part I on January 27, 2003, and completed part II on January 31, 2003.

In March and April of 2003, Kandalec applied to First Colony for life insurance coverage in the amount of $250,000.  In his First Colony application, Kandalec again named Martin Wachel as policy owner and beneficiary.  The First Colony application consists of two parts.  Kandalec completed part I on March 20, 2003, and completed part II on April 7, 2003.

Both applications required Kandalec to answer specific questions about his medical history and other matters that could potentially affect Transamerica's and First Colony's risk in issuing life insurance coverage.  In his Transamerica application, Kandalec answered "no" to questions asking whether in the past five years he had undergone observation or treatment at a clinic, hospital, or sanitarium, and whether he had ever received treatment or joined an organization for alcoholism or drug addiction.  In his First Colony application, Kandalec answered "no" to questions asking whether in the past ten years he had been treated for, or medically advised to be treated for, alcohol or drug use, chest pain, seizures/convulsions, or ulcer/gastritis.  Kandalec further answered that in the past five years he had not received treatment from a healthcare provider or treatment facility; had not undergone an EKG, x-ray, or other diagnostic test, other than an AIDS related test; and had not been prescribed medication for a physical or mental disorder.[2]

In both applications, Kandalec and Wachel signed a provision affirming that the statements and answers given were true, complete, and correctly recorded to the best of their knowledge and belief.  As part of the Transamerica application, Kandalec and Wachel signed a provision in the application affirming that they understood that omissions or misstatements in the application could

---

[2]Wachel contends that Kandalec failed to answer a number of inquiries in the First Colony application. However, reviewing the application, the Court finds that Kandalec responded to all questions in part II, which is the section of the application that requests information regarding his medical history. Question 3.f. contains an answer space asking for a "yes" or "no" answer.  The "yes" or "no" options are left blank but are followed by a responsive medical explanation below, providing more detail than a simple "yes" or "no."

cause an otherwise valid claim to be denied.  Kandalec submitted his completed applications to the insurance companies.

As part of its background check prior to deciding whether to issue a policy to Kandalec, Transamerica ordered a blood and urine test.  Transamerica also used a third-party vendor, ScanTech, to request medical records from Kandalec's treating physician, Fred Adler, M.D.  In response to its request, Transamerica received nine pages of medical records.  Transamerica turned the nine pages over to Wachel in discovery.[3]  The nine pages of medical records that Transamerica produced state that Kandalec received the following medical care:

(a) On August 22, 2001, at 11:20 p.m., Kandalec reported to the St. Catherine Hospital emergency room with a laceration on his chin and stated that he fell.  He denied any seizure or loss of consciousness, but his prior medical history was significant for seizure disorder and the seizure medication Dilantin.  Physicians took an x-ray of Kandalec's jaw and diagnosed him with a fractured mandible.  His chin was sutured and he was told to follow-up with Dr. Adler for suture removal.  Physicians prescribed penicillin for home use.

(b) On August 30, 2001, Dr. Adler removed the sutures from Kandalec's chin.  Dr. Adler noted that Kandalec smelled of alcohol.[4]

Following its review of the relevant records, Transamerica approved Kandalec's application.

Transamerica issued policy no. 42 093 931 with an issue date of March 15, 2003, insuring the life

---

[3]Wachel contends that Transamerica received and failed to produce three additional pages of medical records, which he speculates concern a 1998 hospital visit that is not mentioned in the nine pages produced by Transamerica. Wachel's factual allegation is discussed *supra* in connection with his Motion for Spoliation.  While this section analyzes the facts in a light most favorable to Wachel, there is no credible evidence to support Wachel's claims that the Defendants were in possession of three additional pages of medical evidence that disclosed the medical conditions which were omitted from Kandalec's insurance applications.  The Court is under no duty to rely on facts that are unsupported by the record, *see McRoy v. Sheahan*, 205 Fed. Appx. 462, 464 (7th Cir. 2006) (citing *Payne v. Pauley*, 337 F.3d 767, 770, 773 (7th Cir. 2003); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)) ("Although we take the facts in the light most favorable to [the plaintiff], his conclusory denials of the defendant's facts and his own conclusory allegations unsupported by specific facts will not suffice"), and chooses to not rely on Wachel's continued unsupported insistence that the three additional pages of medical records were in Transamerica's possession.

[4]At deposition, Transamerica underwriter John Reynolds testified that he was unable to read the notation indicating that Kandalec smelled of alcohol at the time of underwriting the policy.  Wachel does not dispute this statement.  At deposition, Dr. Adler confirmed that the notation does state that Kandalec smelled of alcohol.

of Kandalec for $1,000,000.00.  The policy provides that after it has been in force for two years during the insured's lifetime, absent fraud or nonpayment of premiums, the policy will be incontestable. First Colony obtained and reviewed the results of the blood and urine tests conducted by Transamerica.   First Colony then approved Kandalec's application and issued policy no. 8,172,263 with an issue date of May 5, 2003, insuring the life of Kandalec for $250,000.00.  The policy provides that statements made in the application will be incontestable after the policy has been in force for two years during the insured's lifetime.

On May 20, 2004, Kandalec was admitted to St. Catherine Hospital.  Hospital records note a long history of alcoholism and alcohol withdrawal seizures.  It is noted that the previous night, Kandalec was across the alley from his home consuming alcohol with friends.  When he returned home that evening at approximately 1:30 a.m., his mother encountered him, and from her perspective, he looked normal.  At approximately 4:30 a.m., Kandalec's mother heard a loud noise in his bedroom.  She went to check on him and found Kandalec face down on the floor.  Kandalec was taken to the hospital and a CT scan revealed a massive epidural hematoma, a markedly compressed brain stem, and damage to the infratentorial structures from a concussive injury. Physicians diagnosed Kandalec with a total brain injury.  Kandalec went into a coma, his breathing maintained by respiratory measures.  Kandalec died on May 22, 2004.  His death certificate states that he fell and struck a dresser in his room at his residence.  The medical records from St. Catherine Hospital state that Kandalec suffered a closed head injury.

Thereafter, Wachel submitted claims on the life insurance policies.  Because Kandalec died within two years of the issue date of both policies, the policies were within their contestable periods. The Defendants investigated Kandalec's background and contend that they discovered significant

22

undisclosed medical history, including the following information relevant to the answers on Kandalec's insurance applications:

(a) On January 31, 1983, Kandalec presented at Tri-City Mental Health Center, having been referred by the Hammond City Court after numerous incidents of public intoxication. Kandalec completed ten days of detoxification, where he remained guarded and closed during treatment.

(b) Kandalec was again admitted to Tri-City Mental Health Center for detoxification on October 14, 1985, after referring himself. His presenting problems were alcohol related. It is noted that Kandalec began drinking alcohol at eight years of age, drinks one case of beer per day during drinking bouts, blacks out while drinking, that his mother and brother were alcoholics, and that his father died of alcoholism. Kandalec completed nine days of the ten day residency detoxification program. Kandalec was recommended to utilize further outpatient services at Tri-City Mental Health Center and to use Alcoholics Anonymous for community support.

(c) On March 15, 1987, Kandalec presented to Tri-City Mental Health Center for excessive alcohol intake, problems caring for his environment, problems maintaining sobriety, alcoholism, and had a blood alcohol level of .16 mg/dL.

(d) On September 11, 1987, Kandalec presented to Tri-City Mental Health Center with excessive alcohol intake problems, trouble caring for his environment, and a blood alcohol level of .250.

(e) On September 19, 1987, Kandalec was readmitted to detoxification. It is noted that Kandalec had been drinking daily for ten years and had been unemployed for three and a half years. During the course of residency, he reported drinking as being a problem in his life.

(f) On November 19, 1987, Kandalec was admitted to the Tri-City Mental Health Center medical unit by Dr. Adler for severe abdominal pains three days after drinking. The entry also notes that Kandalec had been jailed for 90 days in Lake County Jail for public intoxication.

(g) On December 3, 1987, during a follow-up telephone conference with Tri-City Mental Health Center, it is noted that Kandalec was recently hospitalized at St. Catherine for acute alcoholism.

(h) On January 26, 1988, Kandalec presented at Tri-City Mental Health Center with alcoholism and difficulty caring for his environment due to alcoholism. It is noted that despite a follow-up call, Kandalec never appeared for outpatient therapy.

(i) On September 1, 1989, Kandalec was admitted to Tri-City Mental Health Center with alcoholic pancreatitis and ethanol intoxication. Upon discharge, Kandalec was diagnosed with chronic alcoholism, acute gastritis, serous pancreatitis, irritable bowel syndrome, and acute bronchitis.

(j) On July 3, 1990, Kandalec presented to Tri-City Mental Health Center with an alcohol problem after treatment at St. Catherine emergency room and was assigned to the Intensive Outpatient Program.

(k) On September 21, 1992, during a follow-up telephone call from Tri-City Mental Health Center, Kandalec stated that he was drinking one case of beer per day.

(l) On November 6, 1992, during a follow-up telephone call with Tri-City Mental Health Center, Kandalec stated that he used alcohol daily. It is noted that he was speaking incoherently and could not finish answering questions.

(m) On February 14, 1994, Dr. Adler examined Kandalec at St. Catherine Hospital and noted that Kandalec was admitted after suffering a seizure related to his epilepsy and excessive use of alcohol.

(n) On February 15, 1994, Kandalec was admitted to St. Catherine Hospital and examined by Dr. Fred Adler regarding his chronic alcoholism and related seizures.

(o) On February 16, 1994, while at St. Catherine Hospital, Kandalec stated that he attends Hessville Alcoholics Anonymous meetings once a week and was told that he should attend daily.

(p) On June 14, 1998, Kandalec reported for treatment to the emergency room at St. Catherine Hospital complaining of chest pain and nausea. He denied alcohol ingestion and reported a history of epilepsy and that he had not taken Dilantin for one month. A St. Catherine Hospital emergency room physician noted a strong odor of alcohol on Kandalec's breath. Kandalec vomited water and "gastric contents" approximately six hours after entering the emergency room. Upon blood testing, Kandalec was shown to have a blood alcohol content of .281. Kandalec underwent two electrocardiogram studies to test his cardiac function and was ultimately diagnosed with alcohol intoxication and acute gastritis, was told to avoid alcohol consumption, and to follow-up with Dr. Adler.[5]

---

[5]The Court notes that many of the above described treatment incidents are outside the scope of the five or ten year medical history questions contained in the Defendants' insurance application forms. The Court nevertheless lists the treatments in this fact section because some of the incidents are relevant to other questions in the applications and in order to provide a complete summary of Kandalec's medical background as it was described in the records produced to Transamerica after Wachel filed claims.

On April 12, 2005, Transamerica advised Wachel that it was denying liability on the policy due to misrepresentations in the insurance application.  And on May 3, 2005, First Colony informed Wachel that it was denying payment on its policy.  Both Transamerica and First Colony tendered full refunds of all premiums paid on the policies.

## STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out

to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter,

but instead to determine whether there is a genuine issue of triable fact.  *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.


## ANALYSIS

In their Motions for Summary Judgment, the Defendants ask the Court to find that the life insurance policies at issue are void due to material misrepresentations in Kandalec's policy applications, and to enter judgment in their favor as a matter of law.  In response, Wachel asks the Court to find that issues of material fact remain and that summary judgment is inappropriate. Wachel asserts that the Defendants knew or had reason to know of the medical history that Kandalec failed to disclose in his insurance applications and thus waived their right to void the policy, or in the alternative should be estopped from asserting that right.

### A.  Misrepresenting a material fact

Transamerica contends that Kandalec materially misrepresented his medical history in his application for life insurance by falsely denying a history of alcoholism and admissions to hospitals and treatment centers for alcoholism despite questions in the application specifically requesting that information.  First Colony argues that Kandalec materially misrepresented his medical history in his application for life insurance by falsely denying a history of alcoholism, seizure disorder, and admissions to a hospital for alcoholism, seizure disorder, gastritis, and chest pain, despite questions in the application specifically requesting that information.  Both Defendants contend that they would not have issued life insurance policies to Kandalec had they known his true medical history, and that as a result, the policies are now void.  Wachel devotes little time addressing this issue in his brief opposing summary judgment.   Nevertheless, the Court analyzes the law as it pertains to misrepresentations in Kandalec's applications.

27

Under Indiana law, an insurance company may void coverage when there has been a material misrepresentation on the insurance application. *See Foster v. Auto-Owners Ins. Co.*, 703 N.E.2d 657, 659 (Ind. 1998); *Jesse v. Am. Comm. Mut. Ins. Co.*, 725 N.E.2d 420, 423 (Ind. Ct. App. 2000)). A fact is material where misrepresentation of the fact could reasonably influence the insurer in deciding whether to accept or reject the insured risk. *See Fed. Kemper Ins. Co. v. Brown*, 674 N.E.2d 1030, 1035 (Ind. Ct. App. 1997)). A material misrepresentation prevents a "meeting of the minds" as to the terms of the contract. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 672 (Ind. 1997) (citing *Stockberger v. Meridian Mut. Ins. Co.*, 395 N.E.2d 1272, 1279 (Ind. Ct. App. 1979)).

Indiana courts recognize two views of misrepresentation of a material fact. *See Guzorek*, 690 N.E.2d at 672-73. Under the first view, when an insured misrepresents a fact that would have influenced an insurer's decision to issue the policy, the entire insurance contract is voidable at the insurer's option. *See id*. at 673. Whether the applicant intended to mislead the insurer is irrelevant. *See id*. The second view applies in circumstances where an insurer seeks to rescind a policy after a loss has already occurred. *See id*. In such circumstances, a court measures materiality against the loss. *See id*. Coverage of the incurred loss is voided if the misrepresentation affected that risk, but all other coverage under the policy is not necessarily void. *See id*.; *Foster* 703 N.E.2d at 659. The materiality of the misrepresentation is a question to be resolved by the finder of fact unless reasonable minds could not differ. *See* Guzorek, 690 N.E.2d at 673.[6]

A factual setting nearly identical to the instant case is seen in *Watson v. Golden Rule Ins. Co.*, 564 N.E.2d 302, 303 (Ind. Ct. App. 1990). In *Watson*, an insurance applicant stated on his

---

[6]In 2006, this Court considered a similar case involving questions as to whether misrepresentations in an insurance application were material and whether the insurer had notice of the misrepresentations such that it could not rescind the policy. *See Buckeye State Mutual Ins. Co. v. Hall*, No. 2:05-CV-21, 2006 WL 3450603 (N.D. Ind. Nov. 29, 2006) (Cherry, J.). Here, the Court analyzes the same law set forth in *Buckeye* and applies it to the facts of this case.

application for coverage that he had not, within the past ten years, had any indication, diagnosis, or treatment for any alcohol or drug related disorder.  The insurer approved the applicant for coverage.  Nine months later the applicant was hospitalized for alcohol and drug dependency treatment, for which he submitted a claim to the insurer.  The insurance company investigated the claim and discovered that the applicant had a twelve year history of alcohol and drug abuse, that he consumed a large quantity of whiskey every day, and that for several years he had exhibited symptoms of chronic alcohol abuse such as blackouts, shakes, and hallucinations.  The court found that there could be no reasonable difference of opinion that the omission of alcoholism and drug addiction from his application for heath insurance influenced the insurance company to insure the applicant.  *See id*. at 306.  In awarding summary judgment to the insurance company, the court found persuasive an affidavit submitted by the company's senior claims analyst indicating that the company would not have issued a policy to the applicant had he been honest and forthcoming in his application.  *See id*.  The applicant was unable to rebut the analyst's assertion.

Here, the alleged material misrepresentations occurred when Kandalec failed to disclose his medical history of alcoholism on one application, and his history of alcoholism, seizures, gastritis, and chest pain on the other insurance application.  Both applications specifically requested that information.  Transamerica's application asked whether Kandalec had undergone observation at a clinic, hospital, or sanitarium within the previous five years.  Kandalec completed this portion of the application on January 31, 2003, and answered "no."  However, in the five years before that date, Kandalec had reported to St. Catherine Hospital on June 14, 1998, with a blood alcohol level of .281 and was diagnosed with alcohol intoxication.  In addition, the application asked whether Kandalec had ever received treatment or joined an organization for alcoholism.  Kandalec answered "no" despite the fact that on February 16, 1994, while at St. Catherine Hospital, Kandalec stated that he

attended Hessville Alcoholics Anonymous meetings once a week, and he had been admitted to Tri-City Mental Health Center on multiple occasions to detoxify and for alcohol treatment.

In support of its claim that it would not have issued a life insurance policy had Kandalec's true health history been known, Transamerica submitted the affidavits of two underwriters. The first underwriter, Tracy Livingston, has over twenty five years of experience as an underwriter and was a managing consultant for Transamerica's EX underwriting team at the time Kandalec's policy was issued and is now the company's Director of Underwriting Audit. The second underwriter, John Reynolds, has more than ten years of experience as an underwriter and was the company's Managing Consultant at the time Kandalec's policy was issued and is now employed as a Senior Underwriting Consultant by Principal Financial Group. Both affiants certify that based on their experience in the insurance underwriting industry and their knowledge of Transamerica's guidelines and practices, had Kandalec's true health history, including his history and treatment for alcoholism and alcohol abuse, been disclosed, a life insurance policy would not have been approved.[7]

First Colony's application asked whether, in the past ten years, Kandalec had been treated for, or been medically advised to be treated for, alcohol or drug use, chest pain, seizures, or gastritis, among other conditions. Kandalec answered "no" to each condition, when in fact in the past ten years, medical records reveal that he had been treated for alcoholism on the occasions mentioned above in connection to the Transamerica analysis and on February 15, 1994, when he was admitted to St. Catherine Hospital and examined by Dr. Fred Adler due to alcoholism and a recent seizure. With regard to seizures, Kandalec's medical history reveals that on February 14, 1994, Dr. Adler

---

[7]Ealier in this Opinion and Order, the Court found that Tracy Livingston was not competent to certify that Transamerica approved Kandalec's policy relying upon the representations in his application. The Court distinguishes the subject discussed here, namely, if Transamerica had known of Kandalec's true health history, whether it would have still approved his application. The latter determination is based on Livingston's experience as an underwriter and familiarity with Transamerica's guidelines, and was not challenged by Wachel as an opinion that should be stricken.

treated Kandalec for his history of epileptic seizures; on June 14, 1998, Kandalec reported to St. Catherine Hospital and it is noted that he had a history of seizure disorder but had not taken Dilantin for one month; and on August 22, 2001, Kandalec again reported to St. Catherine Hospital and it is noted that he had a history of seizure disorder and was currently taking Dilantin.  With respect to chest pain and gastritis, Kandalec reported to St. Catherine Hospital on June 14, 1998, complaining of chest pain, and in that same visit, the hospital records note that Kandalec suffered from acute gastritis.  The above medical history also establishes that Kandalec falsely responded to questions asking whether, in the past five years, he had consulted with or received treatment from a care provider or treatment facility, had an x-ray, or had medication prescribed for a physical or mental disorder.

In support of summary judgment, First Colony submitted the affidavits of two employees: Robert Embrey, who has over forty years of experience as an underwriter in the insurance industry and until recently retiring in 2007, was a Vice President and Chief Underwriter for First Colony, and George Young, who has over thirty-five years of experience as an underwriter in the life insurance industry and has worked as an Underwriter Analyst for First Colony since February, 2001.  Young was also personally involved in reviewing Kandalec's application for life insurance.  Both affiants state that based on their experience in the insurance industry and their knowledge of First Colony's guidelines and practices, if they had known Kandalec's true heath history, they would have declined his application.

Following Kandalec's false answers, both applications contain Kandalec's and Wachel's signatures, representing that the information contained within the applications was true, complete, and correctly recorded to the best of their knowledge.  Wachel has failed to submit any evidence to dispute the statements made in the Defendants' employees' affidavits.  In addition, according to the

medical records, Kandalec died from injuries he sustained in a fall that he suffered after consuming alcohol, a loss that goes directly to the misrepresented risk.  Accordingly, the Court finds that just as in *Watson*, here there can be no reasonable difference of opinion that the incorrect answers regarding medical history on Kandalec's application influenced the Defendants' decision to issue the policies.  Thus, the Court finds that the false answers amount to misrepresentations of material fact under either view that Indiana law takes of the issue.

### B.  Notice of medical history

Wachel devotes the majority of his briefing to arguing that the Defendants knew or should have known of Kandalec's true medical history.  Wachel argues that due to the availability of information regarding Kandalec's medical history, the Defendants waived their right to void Kandalec's life insurance policies, or should be estopped from asserting that right.  The Defendants contend that under the facts of this case, they did not have notice of Kandalec's true medical history, and they were under no affirmative duty to investigate the answers or claims made in Kandalec's life insurance policies.  The Defendants argue that Kandalec and Wachel are responsible for the misrepresentations contained in the applications and should bear the loss that resulted therefrom.

In Indiana, an insurer can waive its right to void coverage based on a material misrepresentation if it had actual knowledge of the true facts, or if a reasonable person would have investigated further.  *See Foster*, 703 N.E.2d at 660 (citing *Guzorek*, 690 N.E.2d at 674); *American Family Mutual Ins. Co. v. Jeffery*, No. IP 98-1085-C H/G, 2000 WL 680410, at *3 (S.D. Ind. Feb. 28, 2000).  However, an insurer may rely on the representations of fact contained within an application for insurance that are attested to by the applicant and is not under a duty to look beyond the representations as they appear on the application.  *See id*.  The Indiana Supreme Court has justified this rule by explaining that "[i]t is not unreasonable to demand that an insured supply

accurate and complete information, read the application before signing it, and suffer the consequences if an omission or misstatement in the application is material to a subsequent loss." *Foster*, 703 N.E.2d at 660.

Under Indiana law, the Defendants were entitled to rely on the certified representations in Kandalec's insurance applications. In *Ruhlig v. Am. Comm. Mut. Ins. Co.*, 696 N.E.2d 877 (Ind. Ct. App. 1998), the insured omitted a significant portion of her medical history from her insurance application, including a history of chronic pulmonary disease. However, the insured did authorize the release of all medical records to the insurer. The insurer did not avail itself of this opportunity to obtain medical records. Several months after the insurer approved coverage, the insured underwent heart surgery. The insurer subsequently investigated the insured's medical history, discovered her true background, and denied coverage based on the misrepresentations in her application. The insured filed suit and argued that the insurer was precluded from rescinding the policy because it was on notice of her undisclosed condition through certain general background information that she had disclosed in her application, and because it had the ability to obtain more medical information. The court disagreed, finding that the insurer did not have a duty to obtain and review the insured's medical records for inconsistencies or misstatements on her application. *See id*. at 881. The application contained a signed statement by the insured certifying that her answers were true and complete to the best of her knowledge. The court found that the insurance company reasonably believed that the insured was truthful in answering the application questions. *See id*.

Wachel attempts to circumvent the holding in *Ruhlig* and relies on *Prudential Ins. Co. of Am. v. Winans*, 325 N.E.2d 204 (Ind. 1975), to support an argument that Kandalec's authorization of the release of his medical records imposed a duty on the Defendants to investigate further. In *Winans*, the Supreme Court of Indiana, under a principal-agent relationship theory, found that an insurance

company was bound by information provided to an insurance agent who filled out a life insurance policy for a potential insured. *See id*. at 206. The insured failed to mention several treatments for an ulcer on his application but did grant the insurer authority to access his medical records. The insurer approved the policy. Subsequently when the insured became ill and was hospitalized for ulcer surgery, the insurance company attempted to rescind the policy based on the insured's misrepresentation of his history of ulcers. The insured objected and the insurer brought suit, requesting that the court resolve the issue. The trial court found in the insured's favor. The Supreme Court of Indiana upheld the finding of the trial court, relying on the fact that the insured gave the insurer authority to discover his medical history from all doctors who had treated him. The court found that a jury could reasonably find that the insured had been honest with the insurance agent and that any omissions on the insurance application were omissions of the insurance company's agent, not the insured. *See id*.

There are several differences between the instant case and *Winans*, which render the duty imposed by the *Winans* court inapplicable here. First, in *Winans* the insured did not provide his signature verifying that the contents of his insurance application were truthful and complete. Here, as in *Ruhlig*, Kandalec (and Wachel) did provide a signature verifying the truthfulness of his application responses, thereby giving the Defendants cause to rely on his answers. Second, the application in *Winans* did not contain an affirmative misrepresentation, rather, it contained an omission that the court found a jury could determine was not material. Here, Kandalec made several affirmative misrepresentations on both of the Defendants' insurance applications, marking "no" in response to medical history questions that should have correctly been checked "yes."

Based on *Ruhlig* and *Winans* and similar Indiana precedent, the Court finds that the Defendants had no duty to inquire beyond the certified representations in Kandalec's applications.

The Defendants were entitled to rely on those representations and issue insurance policies. However, unlike in *Ruhlig* and *Winans*, here, the Defendants chose to investigate beyond Kandalec's applications and obtained additional medical evidence prior to issuing policies to Kandalec. The Defendants' decision to go beyond Kandalec's applications changes the burden imposed with regard to their investigation prior to issuing policies to Kandalec.

Kandalec authorized the Defendants to obtain medical records from his background. Transamerica exercised this right and obtained records from Dr. Adler, Kandalec's treating physician.[8] Transamerica also obtained blood and urine from Kandalec and conducted laboratory tests on the samples. First Colony obtained the blood and urine lab results from Transamerica prior to issuing a policy to Kandalec. Thus, the Defendants obtained independent knowledge on their own initiative prior to issuing policies. They cannot now claim ignorance of the information that came to light through their investigation. *See Foster*, 703 N.E.2d at 660 (citing *Guzorek*, 690 N.E.2d at 674); *Jeffery*, 2000 WL 680410 at *3; *see also Ruhlig*, 696 N.E.2d at 881 ("If representations in an insurance application are false and material the policy may be rescinded, unless the insurance company has in some way waived the benefit of avoidance by its conduct and knowledge of the facts").

Having established that the Defendants cannot claim ignorance of information discovered through their investigation prior to issuing Kandalec's policies, Wachel further contends that by obtaining the records, the Defendants triggered a "duty of investigation." Pl.'s Summ. J. Resp. Br. at 11. This duty is briefly described in *Foster* and *Jeffery* as precluding the defense of material

---

[8]Transamerica obtained nine pages of medical records. First Colony states in its brief, and underwriter George Young states in his affidavit, that neither First Colony nor its representatives reviewed the nine pages of medical records provided by Dr. Adler prior to approving Kandalec's policy. Wachel does not dispute this fact and acknowledges that "First Colony [] chose not to obtain records from Kandalec's attending physician, Dr. Adler before approving the application." Pl.'s Summ. J. Resp. Br. 6.

misrepresentation if the insurer had actual knowledge of the true facts, or if a reasonable person would have investigated further. *See Foster*, 703 N.E.2d at 660; *Jeffery*, 2000 WL 680410, *3. In this case, Transamerica triggered this duty through its voluntary investigation, wherein it gathered certain medical records and laboratory results. First Colony triggered the duty by obtaining the results of the lab tests ordered by Transamerica. The Defendants will be precluded from using the material misrepresentations as a defense to void the policies if the information discovered through their investigation either (1) placed them on actual notice of Kandalec's true medical history, or (2) would have caused a reasonable person to investigate further.[9]

*Foster* is instructive on what actions trigger an insurer's duty to investigate. *See* 703 N.E.2d 657. In *Foster*, the insured made material misrepresentations on his application for fire insurance on his home. The insured represented that he had not suffered any losses on his home in the past five years when in fact he had suffered at least three fire related losses in that time. When the home subsequently suffered fire damage, the insurer denied coverage based on the misrepresentations. The insured argued that the insurer was precluded from asserting material misrepresentation as a defense because it was on notice of the actual fire history of the home through other insurance applications that the insured had submitted to the insurer around the same time for other residential

---

[9]Wachel argues that all of the knowledge contained in Transamerica's underwriting file, including Dr. Adler's medical records, is imputed to First Colony. Wachel contends that this is an issue of fact to be resolved by the trier of fact. Wachel offers no law in support of this argument and First Colony does not specifically respond to the contention. The Court finds that the issue of whether the knowledge contained in Transamerica's underwriting file can be imputed to First Colony is an issue of law. The Court relies on the *Foster* court's reasoning, which is more fully explained *infra*, that a single insurance company is not deemed to have knowledge of all applications submitted to it by a single individual, including rejected applications, in evaluating a later application submitted by that person. *See* 703 N.E.2d at 660. Here, the relationship between applications is further removed. Not only are there two different applications in this case but here the applications were submitted to two different insurance companies. The Court finds that there is no evidence that First Colony reviewed Dr. Adler's medical records or had notice of the medical records prior to issuing Kandalec's policy. Without evidence showing that First Colony reviewed the medical records or had notice of their contents, the knowledge of those records will not be imputed to First Colony solely because Transamerica was in possession of the records.

properties in the area.  The insurer had denied the other applications.  In rejecting this argument, the court found "no designated evidence in this record to support a finding that [the insurer] was in fact on notice of the omissions [in the misrepresented application] based on the submission of applications for other property owned by [the insured] or from any other source."  *Id*. at 660.

Here, Wachel contends that there is evidence to support a finding that the Defendants were on notice of his true medical history.  The Court finds that notice of Kandalec's true medical history could have arisen from two sources: an elevated alkaline phosphatase liver enzyme finding in the blood test conducted by Transamerica, which both Defendants had notice of prior to issuing policies, or a notation written by Dr. Adler indicating that Kandalec smelled of alcohol at his August 30, 2001 doctor visit, which only Transamerica had notice of.  The notation that Kandalec smelled of alcohol on August 30, 2001, is handwritten in the "general appearance" section of Dr. Adler's record of the visit and is illegible.  Dr. Adler testified at deposition that the notation does indeed state that Kandalec smelled of alcohol.  In his deposition, Transamerica underwriter John Reynolds, who worked on Kandalec's policy, testified that he was unable to read the notation prior to issuing the policy.  Wachel does not dispute this statement.  The issue then is does a genuine issue of material fact exist as to whether a reasonable person would have investigated the illegible handwritten notation further before issuing a $1,000,000 life insurance policy.  According to Reynolds' testimony, the notation was illegible.  Therefore, to Reynolds, the note could have said anything, possibly indicating that Kandalec suffered from a condition far more serious than smelling of alcohol.  Transamerica did not take any further action to discover what the note said prior to issuing Kandalec's policy.  Rather, Transamerica issued a $1,000,000 life insurance policy without being able to fully review the applicant's disclosed medical history.  The Court finds that a genuine issue

of material fact exists as to whether a reasonable person would have investigated the illegible doctor's note further prior to issuing Kandalec's policy.

Addressing the finding that Kandalec had an elevated liver enzyme, Wachel contends that the Defendants failed to adequately consider and in turn investigate the finding's medical implications. Wachel suggests that an elevated alkaline phosphatase liver enzyme finding indicates possible alcohol abuse. In the argument sections of his briefs opposing summary judgment, Wachel exclusively targets First Colony with this argument. Arguing that the liver enzyme finding creates a genuine issue of material fact, Wachel relies on the deposition testimony of Plaintiff's expert Fredric Mendelsohn, whose qualifications are unknown from Wachel's summary judgment filings. Adding to the unclear relevance of Mendelsohn's testimony to this case, Mendelsohn testified in his deposition that he is not an underwriter and is not a doctor, and the Defendants repeatedly refer to Mendelsohn as an attorney.

At deposition, Mendelsohn testified that by not pursuing the elevated liver enzyme finding with a company doctor to determine whether a policy should have been issued, the Defendants failed to meet the appropriate standard of care for underwriting in the insurance industry. However, Mendelsohn later testified in his deposition that he did not know if an underwriter should consult a doctor every time an applicant presents with an elevated liver enzyme finding. Mendelsohn also testified that he is not sure whether policies would have been issued had the Defendants not overlooked the finding. Due to the absence of any evidence that Mendelsohn has relevant professional experience, the Court finds that his testimony is unpersuasive with regard to insurance industry standards of care.

In addition to testifying with regard to the elevated liver enzyme finding, Mendelsohn testified to other alleged shortcomings in the Defendants' investigation. Mendelsohn testified that

in his insurance application, Kandalec indicted that he had been hospitalized approximately one month earlier due to a fall, received a negative x-ray report, and suffered a bruised hip. Mendelsohn testified that there is no indication in the underwriting file that the Defendants made an attempt to investigate the hospitalization but that they should have done so due to the close temporal proximity to issuing the policies. Mendelsohn also testified that due to the value of the policies issued to Kandalec, the Defendants should have made personal contact with Dr. Adler to confirm they had all of Kandalec's medical history before issuing policies, rather than relying on third-party ScanDisc to supply medical records. However, these issues do not concern actual notice. They are issues of inquiry notice, for which Wachel attempts to place an affirmative duty of investigation on the Defendants. As stated above, under Indiana law, no such affirmative duty exists. The alleged investigation shortcomings identified by Mendelsohn may fall under the umbrella of what should have been done if the trier of fact finds that the Defendants should have investigated further. However, no additional duty to investigate arises from Mendelsohn's testimony about the purported shortcomings. In addition, because Mendelsohn does not appear to have any relevant professional experience, the Court again finds his testimony unpersuasive.

Responding to Wachel's argument and Mendelsohn's testimony, First Colony submits the affidavit and deposition testimony of underwriter George Young, who worked on Kandalec's policy. Young testified at his deposition that Kandalec's alkaline phosphatase liver enzyme finding was elevated but still fell within the normal limits, defined by First Colony's guidelines as less than 1.5 times the normal level. Young testified that as a result, no further investigation was required by the company guidelines. First Colony's underwriting guidelines provide that an alkaline phosphatase enzyme finding within 1.5 times the normal range is acceptable. According to the guidelines, only if an applicant tests above 3.0 times normal should the applicant be denied coverage. The guidelines

state that "[underwriter's] judgment needs to be applied in all cases."  Def.'s Summ. J. Br. Ex. A3,

19.  In addition, First Colony points to Dr. Adler's deposition testimony regarding Kandalec's

alkaline phosphatase level.  Dr. Adler stated, "[t]hat liver enzyme by itself has very little

significance. . . .  It's a screening test, and it was slightly elevated."  Def.'s Summ. J. Br. Ex. F, 107.

Further, George Young testified that he independently examined the medical evidence, which

had previously been obtained by Transamerica, and based on his experience and First Colony's

guidelines, made a finding that First Colony should issue insurance to Kandalec.  Beyond

Mendelsohn's testimony, Wachel was unable to refute or present evidence contrary to Young's or

Dr. Adler's assertions.  The burden of creating a genuine issue of material fact is Wachel's, and

other than suggesting that an elevated alkaline phosphatase finding is a sign of alcohol abuse,

Wachel does not establish that the finding placed the Defendants on notice of Kandalec's true

medical history or should have triggered additional investigation.  Therefore, the Court finds that

Wachel is unable to establish that a genuine issue of fact exists as to whether the elevated liver

enzyme gave notice of Kandalec's alcoholism or other undisclosed conditions or that a reasonable

person would have investigated the elevated liver enzyme finding further.

Solely with respect to First Colony, Wachel asserts an additional argument that First

Colony's investigation was insufficient.  Wachel contends that First Colony did not conduct an

independent background investigation of Kandalec, choosing instead to adopt Transamerica's

investigation findings, and as a result, Wachel contends that First Colony waived its right to void

the policy, or should be estopped from asserting that right.  In support of this argument, Wachel

again refers to *Winans* and *Ruhlig*.  While according to Wachel, First Colony did not conduct an

independent background investigation on Kandalec, it did require him to complete an insurance

application.  On that insurance application, Kandalec misrepresented his medical history, and in

addition to failing to disclose a history of alcohol abuse and related treatment, falsely denied that he had a history of seizures, chest pain, or gastritis.  Kandalec then certified his answers.  Indiana law dictates that in this situation, Kandalec, and Wachel as his beneficiary, suffer the loss.  First Colony was under no independent duty to investigate beyond Kandalec's false representations, and the Court previously found that the information gathered by the investigation that First Colony did conduct does not present a genuine issue of material fact as to its reasonableness.

In a final attempt to establish that First Colony did not comply with an alleged duty to investigate insurance candidates, Wachel relies on the deposition testimony of Mike Shaniuk, an employee of Leisure, Werder & Terry, a brokerage company that originates insurance policies for both Transamerica and First Colony.  Shaniuk testified that "[t]here might be occasions where First Colony might be more lenient in the premium evaluations [than Transamerica]."  Pl.'s Summ. J. Resp. Br. Ex. 2, 3.  Wachel uses this statement, which is hardly an affirmative conclusion, to frame an argument that First Colony has lenient insuring practices.  Wachel contends that in this case, those lenient practices led to inadequate investigation prior to issuing the Kandalec policy.  Later in his deposition, Shaniuk testified that he has no experience as an underwriter, has never worked for an insurance company, and was not involved in underwriting either policy at issue in this case or making decisions to approve either policy.  Shaniuk testified that his involvement with the First Colony policy was limited to filling in Kandalec's name.  The Court finds that Shaniuk's lack of personal knowledge of industry underwriting standards and First Colony's specific policies and decisions in this case does not allow his testimony to persuasively support Wachel's argument that First Colony failed to satisfy a duty to investigate, which has also not been legally established.

Having reviewed the parties' arguments and the briefs and supporting documents submitted in furtherance of those arguments, the Court finds that Count Three of Wachel's First Amended

Complaint is not able to be resolved at the summary judgment stage.  The Court denies Transamerica's Motion for Summary Judgment as to Count Three of Wachel's First Amended Complaint and finds that the following genuine issues of material fact remain for resolution by the trier of fact: (1) whether a reasonable person would have conducted further investigation to determine what the illegible note from Kandalec's August 30, 2001, visit to Dr. Adler's office said; and (2) whether a reasonable investigation into the note, if one was required, would have provided sufficient notice to Transamerica whereby it was placed on notice of Kandalec's true medical history.  The Court grants First Colony's Motion for Summary Judgment as to Count One of Wachel's First Amended Complaint, finding that First Colony did not have notice of any information prior to issuing Kandalec's insurance policy that gives rise to a genuine issue of material fact as to whether a reasonable person would have investigated further.

### C.  Bad faith claims

In Counts Two and Four of his First Amended Complaint, Wachel alleges that the Defendants denied liability on the policies for no rational or principled reason, and thus breached their duty to deal with Wachel in good faith.  Wachel further alleges that the Defendants acted with malice, fraud, gross negligence, or oppressiveness, which was not the result of an honest mistake or any other excusable failure.  The Defendants contend that Wachel has not made a sufficient showing to establish his claims of bad faith and that the Court should award them summary judgment as a matter of law.  The Defendants argue that the insurance contracts are void as a result of the material misrepresentations in the applications and that their denial of Wachel's claims was therefore proper as a matter or law, which leads to the necessary conclusion that by lawfully voiding the policies, the Defendants could not have acted in bad faith.

The Court finds that Wachel's allegation is without support.  The Defendants expressly denied payment on Wachel's claims due to the material misrepresentations contained in Kandalec's applications.  While the Court found that there are remaining genuine issues of material fact as to whether Transamerica should have conducted additional investigation into Kandalec's medical history, there is no question as to whether the Defendants denied the policies in bad faith.  Wachel has submitted no evidence in furtherance of this claim and his bare assertions are not sufficient to survive summary judgment.  *See Perez v. Norwegian-Am. Hosp., Inc.*, 93 Fed. Appx. 910, 915 (7th Cir. 2004); *Hall v. Bodine*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998)).  Wachel's allegations that the Defendants acted with malice, fraud, gross negligence, or oppressiveness are equally unsupported.  The Defendants have introduced evidence that they investigated Wachel's claims and Kandalec's background, and based on the results of their investigations, they denied payment.  The Defendants supported their decisions in this litigation through the testimony and affidavits of their employees and the introduction of evidence establishing the materiality of Kandalec's misrepresentations.  Thus, the Court finds that Wachel has not adequately established that the Defendants acted with bad faith and grants summary judgment in favor of the Defendants on Counts Two and Four of Wachel's First Amended Complaint.

### D.  Pre-judgment interest claims

Having found that Wachel's substantive claim for declaratory judgment against Transamerica is not proper for resolution at the summary judgment stage, Count Six of his First Amended Complaint, which seeks pre-judgment interest on Transamerica's insurance policy, cannot now be resolved.  However, because the substantive claim against First Colony is disposed of in this Opinion and Order, Count Five of Wachel's First Amended Complaint, which seeks prejudgment

interest against First Colony, is moot. Thus, the Court grants First Colony's Motion for Summary Judgment on Count Five of Wachel's First Amended Complaint and denies Transamerica's Motion for Summary Judgment on Count Six of Wachel's First Amended Complaint.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** the Plaintiff's Motion to Strike Paragraph 8 from the Affidavit of Tracy Livingston in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 70], **DENIES** the Plaintiff's Motion to Strike Paragraph 13 from the Affidavit of John Reynolds in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 71], **DENIES** the Motion to Determine Spoliation of Evidence in Opposition to Transamerica's Rule 56 Motion [DE 72], **DENIES** the Plaintiff's Motion to Strike Paragraph 8 from the Affidavit of John Reynolds in Support of Rule 56 Motion of Transamerica Occidental Life Insurance Co. [DE 73], and **DENIES** the Plaintiff's Motion to Strike Late-Disclosed Pages of Exhibit A3 to the Affidavit of Robert Embrey in Support of Rule 56 Motion of First Colony Life Insurance Co. [DE 86].   The Court further **GRANTS IN PART AND DENIES IN PART** Transamerica's Motion for Summary Judgment [DE 62], granting the Motion as to Count Four and denying the Motion as to Counts Three and Six.  Finally, the Court **GRANTS** First Colony's Motion for Summary Judgment [DE 65], and First Colony is **TERMINATED** as a party to this litigation. This matter shall proceed to trial on the surviving issues as set forth in this Opinion and Order.

SO ORDERED this 4th day of January, 2008.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record